**Kahan v 960 Franklin LLC**

2025 NY Slip Op 30134(U)

January 6, 2025

Supreme Court, Kings County

Docket Number: Index No. 536153/2022

Judge: Leon Ruchelsman

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : CIVIL TERM: COMMERCIAL 8
-------------------------------------------x
HAIM KAHAN,

                              Plaintiff,                    Decision and order

        - against -                                        Index No. 536153/2022

960 FRANKLIN LLC and DARYL HAGLER,                          January 6, 2025
                              Defendants,
-------------------------------------------x
PRESENT: HON. LEON RUCHELSMAN                               Motion Seq. #8 & #9

     The plaintiff has moved seeking summary judgement. The defendants have cross-moved seeking summary judgement or alternatively seek further discovery. The motions have been opposed respectively. Papers were submitted by the parties and after reviewing all the arguments, this court now makes the following determination.

     The defendant Hagler is a member of CDK Real Estate LLC which is the sole owner of defendant 960 Franklin LLC. On July 19, 2022, 960 Franklin LLC entered into contracts to purchase two parcels of land for $42,500,000 and $400,000 respectively. Down payments were made of ten percent for each parcel. Thereafter, non-party Chesky Weisz approached the plaintiff to invest in a real estate deal. On August 9, 2022 the plaintiff invested and thus wired $4,500,000 to an escrow agent based upon representations of Weisz. The next day, Hagler assigned his rights in 960 Franklin LLC to an entity owned by Chesky Weisz called 960 Franklin Owner LLC [hereinafter the 'Weisz entity']. The assignment was designed to take place in two stages. First,

the Weisz entity would provide a down payment of $4,500,000 and acquire a 51% interest in 960 Franklin LLC and the balance of $49,000,000 would be paid at the closing and the Weisz entity would then acquire the remaining 49% interest in 960 Franklin LLC. Hagler negotiated an extension of the closing for an additional down payment of $4,275,000. Amendments to the contracts were executed whereby an extension of the closing was agreed upon following an additional deposit of $4,275,000. Thus, on August 10, 200 Hagler assigned 51% of his rights in 960 Franklin LLC to the Weisz entity in exchange for $53,500,000 and directed the escrowee agent to transfer $4,500,000 to the seller of the parcels in exchange for the extension of the closing date. Further, the Weisz entity was required to pay ten million dollars by November 1, 2022 to be applied to the purchase price. Concerning the assignment, Hagler stated that "if the Weisz Entity failed to make the $10 million payment by the required deadline, (i) it would be deemed in default of the Assignment Agreement, (ii) my "Reversionary Right" to rescind the 51% Assignment Agreement would be deemed automatically exercised, (iii) it would forfeit any interest in 960 Franklin, (iv) I would be permitted to retain the $4.5 million Down Payment as liquidated damages, and (v) I, acting through 960 Franklin, would be permitted to close directly with the Underlying Sellers for the purchase of the Property" (see, Affirmation of Daryl Hagler,

2

[*2]

¶21 [NYSCEF Doc. No. 116]).

Prior to the closing, on October 28, 2022 the plaintiff Kahan sent a letter to Hagler informing him that he had provided the four and a half million dollar deposit and that Weisz had fraudulently represented the nature of the investment and the pending transaction. That letter went unaddressed.

On November 2, 2022, the day of the closing, the Weisz entity filed for bankruptcy and failed to furnish ten million dollars pursuant to the assignment agreement. At that juncture Hagler, through 960 Franklin LLC closed on the properties in efforts "to prevent the loss of the Deposits" (see, Affirmation of Daryl Hagler, ¶44 [NYSCEF Doc. No. 116]). Hagler explained that upon the default of the Weisz entity, Weisz "automatically forfeited any interest in 960 Franklin, I was entitled to retain the Down Payment as liquidated damages, and I was expressly permitted to close title under the Underlying Sales Contracts and purchase the Property from the Underlying Sellers (through 960 Franklin)" (see, Affirmation of Daryl Hagler, ¶43 [NYSCEF Doc. No. 116]). Thus, Hagler utilized Kahan's funds to salvage the deposits made including Hagler's own deposit.

This lawsuit was filed and Kahan asserted two claims, for unjust enrichment and conversion. The complaint alleges that Hagler unjustly utilized Kahan's investment funds and such funds should be returned. Each party has essentially moved seeking

3

[*3]

summary judgement.

## Conclusions of Law

Where the material facts at issue in a case are in dispute summary judgment cannot be granted (Zuckerman v. City of New York, 49 NYS2d 557, 427 NYS2d 595 [1980]). Generally, it is for the jury, the trier of fact to determine the legal cause of any injury, however, where only one conclusion may be drawn from the facts then the question of legal cause may be decided by the trial court as a matter of law (Marino v. Jamison, 189 AD3d 1021, 136 NYS3d 324 [2d Dept., 2021).

There is a dispute why the funds of Kahan were wired and it is curious that there is no contemporaneous memorandum delineating the nature of the investment. In any event both the plaintiff and defendant each assert that there are no questions of fact and that each is entitled to summary relief.

Hagler asserts the funds were given because "the Weisz Entity needed to pay for the Assignment Agreement to become effective and that would be immediately released to the Underlying Sellers' counsel to secure a deal to acquire the Property through 960 Franklin from the Underlying Sellers" (Memorandum in Opposition, page 2 [NYSCEF Doc. No. 269]). Thus, Hagler insists Kahan was fully aware of the assignment agreement and by investing funds with Weisz, Kahan cannot assert greater rights that Weisz. Thus, by dint of the failure of Weisz to satisfy the conditions of the

4

[*4]

assignment agreement, Kahan too waived any rights pursuant to the agreement and essentially lost his investment. Kahan argues he did not know of such agreement and invested funds thinking there would be a direct purchase of the property. Consequently Hagler utilized his funds unjustly and such funds must be returned.

First, the voluntary payment doctrine does not act to bar the plaintiff's claims sought here. That common law doctrine bars recovery of payments voluntarily made with full knowledge of the facts in the absence of fraud, duress or a material mistake in law or fact (Dillon v. U-A Columbia Cablevision of Westchester Inc., 100 NY2d 525, 760 NYS2d 726 [2003], Overbay LLC v. Berkman, Henoch, Peterson, Peddy & Fenchel P.C., 185 AD3d 787, 128 NYS3d 56 [2d Dept., 2020]). The rationale for the rule is the simple truism that "when a party intends to resort to litigation in order to resist paying an unjust demand, that party should take its position at the time of the demand, and litigate the issue before, rather than after, payment is made" (see, Gimbel Brothers Inc., v. Brook Shopping Centers Inc., 118 AD2d 532, 499 NYS2 435 [2d Dept., 1986]). In Peyser v. City of New York, 70 NY 497, 25 Sickles 497 [1877] the court expanded upon that reason and explained that "the reason of this principle is, that a person shall not be permitted, with the knowledge that the demand made upon him is illegal and unfounded, to make payment without resistance, where resistance is lawful and possible, and

5

[*5]

afterwards to choose his own time to bring an action for restoration, when, perchance, his adversary has lost the evidence to sustain his side" (id). Other jurisdictions are in accord. Thus, in Putnam v. Time Warner Cable of Southeast Wisconsin Ltd. Partnership, 649 NW2d 626, 255 Wis2d 447 [Supreme Court of Wisconsin 2022] the court explained "there are two primary reasons why courts have adopted the voluntary payment doctrine. First, the doctrine allows entities that receive payment for services to rely upon these funds and to use them unfettered in future activities...Second, the doctrine operates as a means to settle disputes without litigation by requiring the party contesting the payment to notify the payee of its concerns. After such notification, a payee who has acted wrongfully can react to rectify the situation" (id).

However, as noted, the doctrine does not apply when the payment is made under a mistake (Caro Capital LLC v. Koch, 653 F.Supp3d 108 [S.D.N.Y. 2023]). Further, the doctrine is not applicable where allegations of fraud and misrepresentation exist (Pike v. New York Life Insurance Company, 72 AD3d 1043, 901 NYS2d 76 [2d Dept., 2010]). Further, the Restatement (Third) of Restitution and Unjust Enrichment §27 [2011] entitled "claimant's Expectation of Ownership" states that "if the claimant makes expenditures to maintain, improve, or add value to property that the claimant reasonably expects to retain or to acquire, and

6

[*6]

(because such expectation is frustrated) another person becomes the unintended beneficiary of the claimant's expenditure, the claimant is entitled to restitution from the other as necessary to prevent unjust enrichment" (id). The comment to this section explains that "the common feature of the cases within this section is the unexpected turn of events that causes another person to enjoy the fruits of an investment from which the claimant had reasonably expected to benefit himself" (id).

In this case, Kahan asserts he invested funds with Weisz to purchase the property directly from the owner and was unaware of any agreement between Weisz and the defendant (see, Affirmation of Haim Kahan, ¶¶4, 18 [NYSCEF Doc. No. 211]). That contention is disputed. Thus, there are surely questions of fact whether the funds were provided by the plaintiff under a mistake or based upon misrepresentations which would question the applicability of the voluntary payment doctrine. These questions of fact foreclose the doctrine's utility at this time.

Considering the motions seeking summary judgement, Hagler presents twelve reasons why the plaintiff's motion must be denied and in fact the court should search the record and award summary judgement to the defendant. Each of these arguments will be considered in turn.

First, Hagler argues that Kahan has admitted he forwarded funds to Weisz.

7

[*7]

Second, Hagler asserts that Kahan's argument he thought a contract would be negotiated by counsel concerning his down payment and an eventual purchase cannot create any questions of fact. Hagler insists that "if Kahan truly believed that the Down Payment would not be released until some contract "acceptable to [his] lawyers" was negotiated with Weisz (Kahan.SJ.Aff. ¶8), *there would have been no reason for Kahan to fund the deposit until that contract was negotiated*" {emphasis in original} (see, Memorandum of Law, page 2 [NYSCEF Doc. No. 269]).

Third, the defendant's argue the absence of any writing of such a proposed contract surely undermines its existence and in fact negates any such belief at all. Hagler argues that "there is no such record because Kahan did not possess that belief. Rather, he knew that he was silently partnering with Weisz by funding the Weisz Entity's Down Payment to make the Assignment Agreement effective" (see, Memorandum of Law, page 3 [NYSCEF Doc. No. 269]). Moreover, the defendant's dismiss Kahan's "story" by asserting it is supporting exclusively by Kahan's own self-serving affidavit.

Fourth, Hagler argues there is evidence Kahan knew he was forwarding funds to Weisz to support the agreement between Weisz and Hagler and there are no questions in this regard. Thus, on August 8, 2022 an email was sent by Shia Weisz, the son of Chesky Weisz to the plaintiff and his associate, outlining the structure

8

[*8]

of the proposed investment. The email details the total amount needed to secure the deal, namely forty-five million dollars and that Kahan would invest five million dollars as a down payment which included plans for soft costs. The email further outlines that Kahan would provide another twenty million dollars at closing and that they would "try and raise together" the remaining twenty million dollars (see, Email, at Exhibit 7 [NYSCEF Doc. No. 241]). The following day Kahan confirmed the contents of the email. Hagler argues this email exchange proves that Kahan was aware of the assignment agreement with Hagler because it is "unbelievable" for Kahan to argue otherwise. Further, Hagler argues, it is really irrelevant whether Kahan was aware of the assignment agreement since such agreement existed and Kahan is bound by his "partner" Weisz.

Fifth, Hagler argues that Kahan performed and in fact wired funds pursuant to the instructions from Weisz. Moreover, two weeks later Kahan opted to purchase the shares of Weisz and eventually paid Weisz two million dollars in furtherance of this buyout before defaulting on any further payments. Hagler insists that Kahan must have known of the assignment agreement. Hagler asserts that "to contend otherwise would also mean that he did not know what he was buying from Weisz when he exercised his option and paid Weisz yet another $2 million to buy him out, and thereby committed $6.5 million to the deal. No reasonable jury

9

could believe that Kahan did not know what he was buying from Weisz (i.e., the ability to close under the Assignment Agreement exclusively through the Weisz Entity) since Weisz's rights and obligations derived only from the Assignment Agreement—the same agreement that governed the Down Payment that Kahan arranged to pay for the Weisz Entity" (see, Memorandum of Law, page 7 [NYSCEF Doc. No. 269]).

Sixth, Hagler insists that Kahan was aware of the assignment agreement because Kahan's production included a copy of the agreement.

Seventh, Hagler argues that Weisz has sued Kahan in a separate action entitled *Weisz v. Kahan*, Index Number 524709/2023 and Kahan never counterclaimed seeking a return of the $4.5 million dollars he gave Weisz. Hagler insists that the failure to seek a return of those funds can only be an implicit admission by Kahan that he was aware of the assignment agreement between Weisz and Hagler and thus could not in good faith seek recovery of those funds.

Eighth, Hagler argues it is "preposterous" that Kahan would not have been aware of the assignment agreement because he is a sophisticated real estate investor.

Ninth, Hagler maintains that Shia Weisz, the son of Chesky Weisz submitted an affidavit and confirmed that Kahan was fully aware of the assignment agreement and consented to its terms.

10

[* 10]

Further, Weisz also has submitted affidavits confirming Kahan's knowledge of the assignment agreement.

Tenth, Hagler argues that the original complaint filed by Kahan, contains an admission he was aware of the assignment agreement. The original complaint states that based upon the representations of Weisz, Kahan and Weisz would purchase property and that "on or about August 9, 2022, Kahan wired $4,500,000 (the "Deposit") directly to Abrams Fensterman for the purpose of funding 960 Franklin's down payment to purchase the Property and participating as a partial owner of the Property" (see, Verified Complaint, ¶11 [NYSCEF Doc. No. 1]).

Eleventh, Hagler argues that Kahan lied about when he first became aware of the assignment agreement. Kahan has represented he first became aware of it shortly before October 28, 2022 when Kahan notified Hagler of his involvement and his fears he had been defrauded by Weisz. Hagler now argues that Kahan had been aware of it for at least a month beforehand when it had been sent to him at the end of September 2022.

Twelfth, Hagler argues that the lawsuit between Weisz and Kahan reveals that Kahan admitted no improprieties or misrepresentations were made by Weisz at all.

Thus, Hagler argues the above facts demonstrate Kahan cannot obtain summary judgement. Moreover, the above arguments eliminate any questions of fact and summary judgement should be

[* 11]

awarded in favor of Hagler.

These arguments will now be addressed. A judicial admission is any act or statement made during the course of a judicial proceeding which essentially concedes a disputed fact (see, Jones v. Morehead, 68 US 155, 17 L.Ed 662, 1 Wall 155 [1863]). Thus, a statement in a pleading admitting ownership of a vehicle is an admission of such ownership and "conclusive" evidence of that fact (Zegarowicz v. Ripatti, 77 AD3d 650, 911 NYS2d 69 [2d Dept., 2010]). Therefore, a formal judicial admission is a substitute for evidence and absolves a party with the need to present evidence that is the substance of the admission (see, State Farm Mutual Auto Insurance Company v. Worthington, 405 F.2d 683 [8th Cir. 1968]). To be considered a formal judicial admission the statement or act must be clear, unequivocal and deliberate (Rahman v. Smith, 40 AD3d 613, 835 NYS2d 404 [2d Dept., 2007]). In this case the mere fact the plaintiff has admitted he agreed to furnish funds to Weisz does not in any way mean he agreed to fund a down payment pursuant to an assignment agreement between Weisz and Hagler. While the original complaint does state the funds were provided as a down payment for defendant 960 Franklin LLC that allegation does not mention the assignment agreement at all. Thus, the nature of the allegation contained in the original complaint is vague and hardly supports a conclusory determination Kahan made an

12

[* 12]

admission regarding all the obligations within the assignment agreement. Likewise, no conclusive proof can be drawn from Kahan's testimony in the action between Weisz and Kahan. First, the assignment agreement was never mentioned within Kahan's testimony. Thus, the absence of any testimony about the assignment agreement is not an admission Kahan knew it existed. More importantly, there is no evidence Kahan conceded Weisz did nothing wrong. Indeed, in Kahan's motion seeking summary judgement dismissing that lawsuit Kahan states that following the deposit he made to the escrow agent "Weisz secretly entered into an assignment agreement which not only provided for this time of the essence provision but additionally that the Venture's contract deposit-Kahan's contract deposit-would be forfeited if the Venture failed to raise the funds to purchase the option which the Assignors held...Weisz never told his co-Venturer (to whom he owed a solemn fiduciary obligation) about this Agreement (He explained at his EBT simply that Kahan never asked! someone who owed his partner a fiduciary obligation)" (Memorandum of Law, page 7 [NYSCEF Doc. No. 37 of Index Number 524709/2023]). Clearly, Kahan harbors beliefs about Weisz's misrepresentations.

Next, Hagler argues Kahan's belief a further contract would be entered into between the seller and Kahan/Weisz must be rejected as patently absurd. Those arguments are based upon Kahan's affidavit wherein he states that he gave funds to Weisz

13

[* 13]

(by wiring an escrow agent) and that those funds "would be released from the escrow account only with my prior authorization, and subject to the terms of a contract acceptable to my lawyers" (see, Affirmation of Haim Kahan, ¶8 [NYSCEF Doc. No. 211]). The speculation that Kahan acted with "no reason" is surely an insufficient basis upon which to conclude there are no questions of fact. It is true that no contract was ever presented to Kahan for the purchase of the properties. However, the absence of any contract is not evidence, and surely not conclusive evidence, that Kahan was aware of the Hagler-Weisz assignment agreement. The defendant assumes that Kahan must have known about the assignment agreement. There is no evidence, other than innuendo, that substantiates that argument.

Thus, as noted, Hagler assumes, without any proof, that Kahan was aware of the assignment agreement and that by wiring funds to Weisz he became bound by all the terms of the agreement. In truth, Hagler's argument rests on the fact that Kahan must have known of the assignment agreement because otherwise he simply foolishly gave Weisz such large sums without knowing precisely how the money was being utilized. While that is certainly a reasonable opinion, it is not irrefutable proof. Likewise, a litigant cannot secure summary judgement by arguing the other party's position is so outlandish that no jury could believe it. Thus, Hagler insists that "no reasonable jury could

14

[*14]

find that Kahan was mistaken about the material terms of Weisz's agreement governing the funds he wired for the Weisz Entity" (see, Memorandum of Law, page 14 [NYSCEF Doc. No. 269]). Summary judgement is not based upon such speculative arguments. The mere fact one party really thinks the other party is being untruthful or one party avers the other party cannot be truthful, no matter how insistent, are not grounds to award summary judgement. In addition, all of Hagler's arguments attempting to connect Kahan to knowledge of the assignment agreement is specious. According to Hagler, the entire nature of the transaction was based upon and rooted in the assignment agreement. The assignment agreement was the crux and central feature of the entire transaction. Yet, there is no writing or mention of it to Kahan at all. Hagler's repeated attempts to draw upon circumstantial evidence, allegations of Kahan's ridiculous positions and insinuation, all to connect Kahan to the assignment agreement, demonstrate there is no obvious and direct evidence of such knowledge. Surely the email sent by Shia Weisz, which it is argued established a "contract" between Weisz and Kahan should have mentioned this most critical and crucial fact. Indeed, could there have been a complete meeting of the minds without that crucial information? The complete absence of any evidence of the existence of the assignment agreement only raises questions of fact whether Kahan was aware of it. Consequently,

15

[*15]

without any sufficient proof eliminating all questions of fact linking Kahan to the assignment agreement and thus to all of Weisz's transactions, summary judgement cannot possibly be appropriate.

Moreover, regarding Kahan's statements he anticipated a contract of sale to be negotiated, there is no conclusive evidence presented that Kahan never believed a contract would be negotiated. In this vein, almost all affidavits (or affirmations) are self serving. That does not affect their admissibility, but rather their weight (St. Pierre v. Dyer, 208 F3d 394 [2d Cir. 2000]). More importantly, the defendant's central argument in this regard is that the plaintiff is simply not credible and nothing he says can raise questions of fact and surely his assertions are insufficient to award summary judgement in his favor. However, the court, at this stage, cannot make credibility determinations. As the court noted in Payne v. Pauley, 337 F3d 767 [7th Cir. 2003] seeking to dismiss affidavits on the grounds of credibility, such action leads the court to "dangerous territory, and we have warned before of falling for the trap of weighing conflicting evidence during a summary judgment proceeding" (id). Thus, the court cannot "denigrate a plaintiff's evidence when deciding whether a material dispute requires trial" (Peterson v. Connecticut Light and Power Company, 2014 WL 2615363 [District of Connecticut 2014]). Hagler argues

16

[*16]

that Kahan's affirmation is "absurd since Weisz's rights derived *only* through the Assignment Agreement" (see, Memorandum of Law, page 22 [NYSCEF Doc. No. 269]). However, that circular argument fails to appreciate that if Kahan was unaware of the assignment agreement he was also unaware that Weisz had entered into such agreement. Hagler further urges the court not "to assume the truth of Kahan's unsubstantiated assertions" (see, Memorandum of Law, Footnote 8 [NYSCEF Doc. No. 269]). Of course, as noted, on a motion for summary judgement the court cannot assume the truth of any assertions, that is the role of the jury. Hagler's repeated and impassioned assertions that it is impossible for Kahan not to have known about the assignment agreement is, at its core, a credibility argument. As noted, the court cannot make such credibility determinations. Moreover, Hagler is left with no choice but to resort to these arguments since, as noted, there is no direct evidence at all, Kahan was aware of the assignment agreement. In any event, it is clear that factual disputes in this regard exist.

Further, Hagler maintains that Shia Weisz the son of Chesky Weisz submitted an affidavit and confirmed that Kahan was fully aware of the assignment agreement and consented to its terms. Additionally, Weisz also has submitted affidavits confirming Kahan's knowledge of the assignment agreement. While those affidavits and testimonies are relevant and surely raise

17

[*17]

questions of fact, they are not conclusive proof sufficient to award summary judgement. By contrast, Kahan's affidavit states that "I was not a party to the Assignment Agreement or the 51% Assignment Agreement or in fact any other agreement or arrangement Hagler had with anyone or any entity, and was, at the time, completely in the dark about the deal Hagler apparently had struck with Weisz—a deal to steal $4.5 million from me" (see, Affirmation of Haim Kahan, ¶17 dated October 1, 2024 [NYSCEF Doc. No. 211]). Again, in another affirmation Kahan stated regarding the assignment agreement that "I had no idea this document existed, was never a party to it, and it cannot form the basis of any surrender of my rights to my own money, which I believed at the time was safely held in the Abrams Fensterman, LLP attorney Trust Account, where I wired it" (see, Affirmation of Haim Kahan, ¶38 dated December 1, 2023 [NYSCEF Doc. No. 228]). Thus, the affirmations of Chesky and Shia Weisz conflict with the affidavit of Kahan. It is well settled that when conflicting affidavits are presented then summary judgement cannot be granted (Lakeview Development at Carmel, LLC v. New York City Dept. of Environmental Protection, 139 AD3d 1016, 30 NYS3d 844 [2d Dept., 2016]).

Next, concerning the email sent by Shia Weisz which Hagler alleges constitutes a partnership agreement or a contract between Weisz and Kahan, notwithstanding credibility arguments that have

18

[* 18]

no place in a motion for summary judgement, the email, as noted, never mentions Hagler or an assignment agreement. Furthermore, the other lawsuit between Weisz and Kahan does not conclusively establish Kahan knew about the assignment agreement. First, not only does the email not support knowledge of the assignment agreement, the email seems to contradict the assignment agreement. The email requires Kahan and Weisz to raise an additional twenty million dollars together. If Kahan knew the assignment agreement existed and was aware of all its terms then the email asserting that Weisz and Kahan would somehow raise the remaining twenty million dollars "together" makes no sense.

Moreover, the lawsuit between Weisz and Kahan only raises more questions than it answers. In that lawsuit, Weisz sued Kahan alleging Kahan failed to abide by the terms of the email agreement which created a joint venture between them. The complaint reiterates that Kahan was required to furnish twenty-five million dollars and the remaining twenty million dollars would be raised by them together, as noted. The complaint also alleges that Kahan sought to engage in a buy-out of Weisz's interests and furnished an additional two million dollars but never furnished the final payment of a million dollars. Weisz sued Kahan and seeks damages in the amount of twenty million dollars for failing to furnish that amount pursuant to the agreement. While that claim may not directly conflict with

19

[* 19]

Hagler's understanding of the transactions that were required to take place, there are surely questions of fact whether Weisz made two distinct promises, one to Kahan and another to Hagler. Thus, pursuant to the "contract" between Kahan and Weisz, Kahan was required to invest twenty million dollars. Pursuant to the assignment agreement between Hagler and Weisz, Weisz was merely required to invest ten million dollars. To be sure, if Kahan knew of the assignment agreement Kahan must have wondered why he was being asked to invest twenty million dollars when only ten million dollars was required to be furnished at the closing. Thus, the email between Shia Weisz and Kahan compels a denial of any summary judgement request and surely raises questions of fact whether Kahan was aware of the assignment agreement.

Next, Hagler argues the parties were "sophisticated", an arbitrary label, thus Kahan was surely aware of the assignment agreement. That argument is undermined by the nature of the alleged contract entered into between Kahan and Weisz. The entire contract is in the form of an email from Weisz's son to Kahan. While the term "sophisticated" may vary depending on the surrounding facts and circumstances, there can be little doubt a "contract" formed in this manner, regarding such a substantial transaction, is quite amateurish. Indeed, Kahan has sought to dismiss the lawsuit Weisz filed against him on these very grounds.

20

[* 20]

Next, the exhibit that contains the copy of the assignment agreement (Exhibit 15 [NYSCEF Doc. No. 249] contains the agreement as part of an email from the escrowee agent to Weisz and other parties but not Kahan. Even if it is true that Kahan was aware of the assignment agreement before he notified Hagler of his involvement, it does not establish Kahan was aware of it when he deposited the funds, the only relevant time frame that can support any summary determination. It is really irrelevant when Kahan discovered its existence and when he chose to inform Hagler about his role in the down payment. In any event, there is no evidence Kahan knew about the assignment agreement when he deposited the funds with the escrow agent.

These arguments can all be distilled into one overarching theses, namely that Kahan knew about the assignment agreement and must be bound by its terms. It is true that if Kahan knew about the agreement and consented to its terms thereby, then he could have no greater rights than Weisz. Thus, the default by Weisz would necessarily devolve upon Kahan as well and Kahan would have no claims against Hagler. Kahan does not really dispute this point. Kahan presents two arguments in response and in support of summary judgement in his favor.

First, Kahan argues that "without privity of contract, Defendants have no basis whatsoever to bind Mr. Kahan to the terms of an Assignment Agreement to which he was not a party, or

21

subject him to its terms, including the "liquidated damages" clause that purportedly entitled Defendants to keep Mr. Kahan's $4.5 million" (see, Memorandum in Reply, page 6 [NYSCEF Doc. No. 282]). Thus, Kahan insists there is no evidence presented that he knew about the assignment agreement and has produced affirmations asserting as much. Thus, summary judgement must be awarded in his favor. However, whether Kahan knew about the assignment agreement is a factual dispute as the court has exhaustively demonstrated.

Kahan also argues that no contract even existed between him and Weisz. He argues that the email sent which is the basis of any agreement between the two of them is insufficient to create obligations flowing between them. While that is the subject of the other lawsuit, for purposes of this litigation, it is sufficient to note that there is no question that some form of agreement was entered into between Kahan and Weisz. Whether it has all the requirements to satisfy the elements of a joint venture is beyond the scope of these motions. The critical, and in fact, undisputed reality, is that Kahan and Weisz entered into some sort of arrangement, however that may be defined. Whether the assignment agreement entered into between Weisz and Hagler can be imputed to Kahan remains a factual question.

Consequently, the court cannot grant any party summary judgement. Therefore, the motions seeking summary judgement are

22

[*22]

hereby denied.

Turning to the motion seeking discovery, in light of the above, the only discovery that is of any relevance is any information concerning Kahan's knowledge of the existence of the assignment agreement. No other information is relevant at all. Thus, the plaintiff must furnish any discovery in its possession, that has not yet been furnished, regarding Kahan's knowledge concerning the assignment agreement. In this regard, the plaintiff shall submit an affirmation, within thirty days of receipt of this order, that all discovery pertaining to his knowledge of the assignment agreement has already been furnished and after a diligent search there is no further information that must be produced.

Thus, the motion seeking to compel any further discovery is granted to this extent.

So ordered.

ENTER:

_____

Hon. Leon Ruchelsman
JSC

DATED: January 6, 2025
Brooklyn N.Y.

23

[*23]